IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**LAWRENCE BROWN, Individually and on**          **PLAINTIFF**
**Behalf of All Others Similarly Situated**

v.          **Case No. 4:22-CV-00020-LPR**

**PENSKE TRUCK LEASING CO., LP, and**
**PENSKE TRUCK LEASING CORPORATION**          **DEFENDANTS**

## ORDER

This is a case about the proper payment of wages. Plaintiff Lawrence Brown, individually and on behalf of all other similarly situated employees, is suing Penske Truck Leasing Co., LP and Penske Truck Leasing Corporation (collectively, "Penske"[1]). Pursuant to the Fair Labor Standards Act and the Arkansas Minimum Wage Act, Mr. Brown seeks to recover unpaid overtime wages, liquidated damages, prejudgment interest, costs, and attorneys' fees.[2] Today's Order does not resolve the merits of Mr. Brown's claim. Instead, the Order only decides the pending Motion for Conditional Certification, for Approval and Distribution of Notice, and for Disclosure of Contact Information by Lawrence Brown.[3] For the following reasons, that Motion is DENIED.

### LEGAL BACKGROUND

The Court has previously set out the relatively low standard for conditional certification in cases such as *Brown v. Trinity Property Management, LLC*,[4] *Mitchell v. Brown's Moving &*

---

[1] Although Mr. Brown has filed suit against both entities, Penske claims that Mr. Brown only worked for Penske Truck Leasing Co., LP. To be clear, Penske says that Penske Truck Leasing Corporation is not a proper party in this case. Defs.' Answer (Doc. 4) ¶ 1. Because the Court is denying certification, it need not address this issue at this time.

[2] Compl. (Doc. 1).

[3] Pl.'s Mot. for Conditional Certification (Doc. 11).

[4] No. 4:19-cv-617-LPR, 2019 WL 6834018 (E.D. Ark. Dec. 13, 2019).

*Storage Inc.*,[5] and *Hopkins v. Calais Forest Equity Enterprises, LLC*.[6]  In so doing, the Court has noted that, while the test for conditional certification is "exceedingly lenient," it "is not the equivalent of a rubber stamp."[7]  To cut to the chase, members of the potential collective must be similarly situated with respect to the alleged FLSA violation.  This requires a plaintiff to make a "modest factual showing sufficient to demonstrate that [he] and [other] potential plaintiffs together were victims of a common policy or plan that violated the law."[8]  Moreover, the common policy identified must cause an alleged FLSA violation to the potential members of the defined collective, and that violation must be similar to the violation to which the named plaintiff has been subjected.[9]  Finally, "the collective cannot be overly broad in terms of time, geographic scope, or definitional scope."[10]

Two points bear emphasis.  First, because Mr. Brown is required to make a factual showing—modest though it may be—he may not rely on unsupported allegations in his Complaint.  He needs some sort of evidence.  Second, although it is true that a court should not be "making determinations about the merits of the parties' claims and defenses at this stage,"[11] that does not mean a court must blindly defer to flimsy evidence of a common policy or plan just because it

---

[5] No. 4:19-cv-00783-LPR, 2021 WL 7541483 (E.D. Ark. Jan. 11, 2021).

[6] No. 4:21-cv-0024-LPR, 2021 WL 4953248 (E.D. Ark. Oct. 25, 2021).  The Court appreciates the briefing from both sides on the appropriate standard that the Court should apply in making its conditional certification decision.  After a thorough review, the Court concludes that it will continue to follow (at least in this case) the two-step certification process used by nearly all district courts across the country and in this circuit.  As explained below, Mr. Brown cannot chin the bar of the lenient standard, and thus consideration of the more rigorous standard proposed by Penske is unnecessary.  *See infra* pp. 10–15.  That's fortunate, because the Court is still struggling to decide which of the two standards is most appropriate under the statute and applicable precedent.

[7] *Hopkins*, 2021 WL 4953248, at *2.

[8] *Mitchell*, 2021 WL 7541483, at *3 (citations omitted).

[9] *Id.*

[10] *Id.*

[11] *Brown*, 2019 WL 6834018, at *3.

happens to double as evidence relevant to the merits of a claim. If it were otherwise, the Court would become the dreaded rubber-stamp in the great majority of FLSA cases.

## FACTUAL BACKGROUND

Penske is a "transportation services provider specializing in full-service truck leasing, commercial and consumer truck rentals, transportation and warehousing management, and supply chain management solutions . . . ."[12] Mr. Brown says that at some point during the last three years of his employment, Penske implemented a uniform policy of requiring its hourly employees to falsely sign a time-adjustment form stating that any hours recorded over 40 were a mis-punch[13] on the time clock.[14] According to Mr. Brown, if the employees refused to sign the form, they received a disciplinary write-up, and three write-ups led to termination.[15] As best the Court can tell, Mr. Brown wants the Court to conditionally certify an FLSA collective consisting of all hourly employees employed by Penske throughout the entire country within the three years prior to the filing of Mr. Brown's Complaint.[16]

---

[12] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 2.

[13] Mr. Brown's and Mr. Kennington's declarations spell "mis-punch" as "miss-punch." However, the Court believes the proper spelling is "mis-punch." So, while it is referring to the same thing, the Court will use "mis-punch" throughout this opinion.

[14] Compl. (Doc. 1) ¶¶ 29–30; Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 8.

[15] Compl. (Doc. 1) ¶¶ 31–32; Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 8.

[16] Pl.'s Mot. for Conditional Certification (Doc. 11) ¶ 3; Sept. 12, 2022 Hr'g Tr. (Rough) at 10. Over his various filings with this Court, Mr. Brown has suggested two different (competing) versions of a potential collective. In his Complaint, Mr. Brown proposed a collective consisting of "[a]ll hourly employees who were paid for any workweek in which (1) their pay was calculated from a time-adjustment form and (2) the payment was for 39 or more hours, at any time within the last three years." Compl. (Doc. 1) ¶ 41. The Complaint's proposed collective definition was significantly broadened in Mr. Brown's Motion for Conditional Certification. In that motion, he asked the Court for conditional certification of a collective "consisting of all Hourly Employees employed by [Penske] within the three years prior to the filing of [Mr. Brown's] Original Complaint . . . ." Pl.'s Mot. for Conditional Certification (Doc. 11) ¶ 3. It is not clear which version of the collective Mr. Brown is pursuing.

Penske is organized into multiple Regions throughout the United States, and each Region is made up of multiple Areas. Each Area operates independently from the other Areas and has its own business management and HR management teams. Each Area is made up of Districts which are further made up of individual Branches.[17] Each Branch is just one Penske store or facility.[18] Mr. Brown was an hourly employee of the Little Rock, Arkansas Branch of Penske from June 7, 2017, until his resignation on April 6, 2022.[19] The Little Rock Branch has around 55 associates and is located in the Little Rock District, which includes ten Branches in Arkansas and Missouri.[20] The Little Rock District is one of several Districts operating in the Central Area, which encompasses Arkansas, Missouri, Iowa, Nebraska, South Dakota, and parts of Kansas, Illinois, and Tennessee.[21] At the Little Rock Branch, Mr. Brown worked as a Maintenance Coordinator and was primarily responsible for purchasing and delivering necessary parts and supplies.[22] But he was also "familiar with the roles of the employees within [Penske's] business because [they] operated as a team, and [he] worked alongside the other employees in whatever their particular job was."[23]

In addition to Mr. Brown, there is one other Plaintiff in this case. On March 9, 2022, about two months after the Complaint was filed, Mr. Thomas Kennington became the potential

---

[17] Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶ 2.

[18] Sept. 12, 2022 Hr'g Tr. (Rough) at 19.

[19] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶¶ 7, 12.

[20] Id. ¶¶ 4–5.

[21] Id. ¶ 4.

[22] Id. ¶¶ 10–11. In Mr. Brown's declaration, he says he was a "Service Administrator." According to his boss, Karen Miller, this was the name of his position at the time he was hired but it was changed to "Maintenance Coordinator" during his employment. Compare id. ¶¶ 10–11, with Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 5.

[23] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 6.

collective's first opt-in Plaintiff.[24]  Mr. Kennington was an hourly employee of the Odessa, Texas Branch of Penske from October of 2004 to June of 2020.[25]  The Odessa Branch typically has around fifteen associates and is in the Fort Worth District.[26]  The Fort Worth District is in the South Central Area, which operates in Oklahoma and parts of Texas, Louisiana, and Kansas.[27]  The South Central Area has different business management and HR management from the Central Area where Mr. Brown worked.[28]  At the Odessa Branch, Mr. Kennington worked as a Service Tech 1 and was primarily responsible for "troubleshooting problems, diagnosing, and repairs."[29]  But, like Mr. Brown, he was also "familiar with the roles of the employees within [Penske's] business because [they] operated as a team, and [he] worked alongside the other employees in whatever their particular job was."[30]

Mr. Brown and Mr. Kennington paint quite the sordid picture.  According to Mr. Brown, hourly employees at the Little Rock Branch were required to clock in and out of work using the same wall-mount digital time clock.[31]  Until June of 2020, any modifications to these time punches were made informally through verbal or written requests to payroll.[32]  However, at the direction

---

[24] Consent to Join Collective Action (Doc. 8).

[25] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶¶ 2–3, 5; Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶ 3.

[26] Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶¶ 3–4.

[27] *Id.* ¶ 3.

[28] *Id.* ¶ 2.

[29] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 5.

[30] *Id.* ¶ 6.

[31] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 7.  According to Ms. Miller, this is not the case for all hourly associates at the Little Rock Branch.  In her estimation, half of all hourly associates at the Little Rock Branch record their time using a computer in the shop rather than a time card.  Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 13.  However, Mr. Brown says they "were all required to clock in and out on the same wall-mount digital time clock."  Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 7.

[32] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶¶ 14–15.

of Central Area HR management, the Little Rock Branch started requiring hourly associates to submit a signed Compensable Time Record form in order to get such modifications.[33] This directive is not the problem alleged by Mr. Brown. Rather, the problem alleged by Mr. Brown is the end to which these forms were supposedly used.

Mr. Brown says that, sometime during the previous three years of his employment, Penske implemented a policy of not allowing hourly employees at the Little Rock Branch to receive pay for more than 40 hours per week, regardless of how many hours they worked.[34] Worse still, he says that hourly employees at the Little Rock Branch "were often required to sign a document stating that [their] hours over 40 were a mis[]-punch on the time clock."[35] If they refused, they would receive a write-up, and three write-ups led to termination.[36]

Mr. Brown does not say in his declaration who at Penske implemented this alleged scheme. He doesn't say whether this was a business-wide scheme, an Area-wide scheme, a District-wide scheme, a Branch-wide scheme, or a scheme implemented by one or more managers within the Little Rock Branch. What Mr. Brown does say is that he and other hourly-paid employees at the Little Rock Branch often worked up to 55 hours per week (i.e., 15 hours per week of overtime)

---

[33] *Id.* ¶ 15. It appears that all Branches in the Little Rock District use the Compensable Time Record form. *See id.* ¶ 17. It is unclear, however, whether the other Branches were already using the form by the time the directive came down to the Little Rock Branch. *See id.* ¶¶ 15, 17.

[34] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 8. Mr. Brown's declaration states that "[a]t some point during the last three years of my employment, Defendant implemented a policy of only allowing us to receive pay for 40 hours of work in a week, regardless of the number of hours that we actually worked." *Id.* In context, it is clear that the "us" in this statement refers to the workers at the Little Rock Branch. After all, Mr. Brown does not suggest in the declaration that he has any personal knowledge of what took place at any other Branch.

[35] *Id.* Mr. Brown's declaration states that "[i]f we worked more than 40 hours in a week, we were often required to sign a document stating that our hours over 40 were a mis[]-punch on the time clock." *Id.* In this context, it is clear that the "we" in this statement refers to the workers at the Little Rock Branch. After all, Mr. Brown does not suggest in the declaration that he has any personal knowledge of what took place at any other Branch.

[36] *Id.*

and were not paid for their overtime.[37] He states that he knows that other hourly employees worked similar hours because he "worked [with them] as a team and [they] were always communicating and working alongside each other to complete . . . various tasks."[38] While he cannot state the exact number of similarly situated employees, from his conversations with other hourly employees, he believes that number exceeds 30 persons.[39]

As for Mr. Kennington in the Odessa, Texas Branch, he tells a similar story. He says that all the "mechanics, service techs, and maintenance coordinators" in his Branch were required to clock in and out of work using the same wall-mount digital time clock.[40] And he says that, at some point during the last three years of his employment, Penske "implemented a policy of only allowing [employees at the Odessa Branch] to receive pay for 40 hours of work in a week" regardless of the actual number of hours worked.[41] Although there is no suggestion that it was called a Compensable Time Record form, Mr. Kennington says that the Odessa Branch employees "would be required to [falsely] sign a document stating that [any] hours over 40 were a mis[]-punch on the

---

[37] Id. ¶¶ 11–12.

[38] Id. ¶ 11.

[39] Id. ¶¶ 13–14.

[40] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶¶ 6–7. Kevin Rodgers, the District Manager for the Fort Worth District, stated that Mr. Kennington recorded his time using a computer in the shop rather than a time clock. Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶ 8. But in Mr. Kennington's declaration, Mr. Kennington stated that he clocked in and out using a "wall-mount digital time clock." Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 7.

[41] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 8; cf. supra note 34.

time clock."[42]  If they did not comply, they would receive a write-up, and three write-ups led to termination.[43]

Like Mr. Brown, Mr. Kennington does not say in his declaration who at Penske implemented this alleged scheme.  He doesn't say whether this was a business-wide scheme, an Area-wide scheme, a District-wide scheme, a Branch-wide scheme, or a scheme implemented by one or more managers within the Odessa Branch.  What Mr. Kennington does say is that he often worked at least 60 hours per week prior to the COVID-19 pandemic, and between 45 and 55 hours per week once the policies were enforced more strictly.[44]  He also claims that other Odessa Branch hourly employees worked similar hours and were not paid for overtime, which he knows because they "worked as a team and were always communicating and working alongside each other to complete . . . various tasks."[45]  Finally, Mr. Kennington says that he was fired for refusing to continue to take the shop phone home with him after hours for work for which he was not getting paid.[46]

The record includes more than just the declarations from Mr. Brown and Mr. Kennington.  Penske submitted declarations from Mr. Brown's boss (Karen Miller) and Mr. Kennington's boss (Kevin Rodgers).  Ms. Miller's declaration includes some documentary evidence concerning the Compensable Time Record forms.  Specifically, the record shows that Mr. Brown submitted

---

[42] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 8; *cf. supra* note 35. Mr. Rodgers stated that Mr. Kennington never filled out a Compensable Time Record form while he worked at the Odessa Branch, and that the Odessa Branch has never required such a form to be submitted.  Further, he does not believe that any branches in the Fort Worth District have such a requirement. Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶¶ 9–10.  In Mr. Kennington's declaration, he stated that he was required to "sign a document," but does not specifically call it a "Compensable Time Record form."  Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 8.

[43] *Id*.

[44] *Id.* ¶ 11.

[45] *Id.* ¶¶ 11, 12.

[46] *Id.* ¶ 8.

twenty-two Compensable Time Record forms during his time at Penske.[47] Of those twenty-two submissions, sixteen actually added time to his punch-clock recorded hours; only six subtracted time.[48] Of the six submissions that subtracted time, four of the submissions subtracted five minutes or less of time.[49] And the other two submissions (where we don't know how much time was subtracted) note that they resulted from Mr. Brown failing to clock out entirely when he left work.[50] These two submissions had nothing to do with "mis-punches."

The record in this case also shows that Mr. Brown and Mr. Kennington were indeed paid for overtime on multiple occasions. Mr. Kennington worked and received pay for 554.14 overtime hours in 2019, and 81.15 hours in 2020 before his termination at the end of June 2020.[51] Mr. Brown worked and was paid for 100.23 hours of overtime in 2019, 2.63 hours of overtime in the first quarter of 2020, and 9.2 hours of overtime from January of 2021 until November of 2021.[52]

---

[47] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 18; Ex. A to Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1).

[48] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 18; Ex. A to Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1).

[49] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 19; Ex. A to Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) at 9, 11, 13, 17, 21, 22. Paragraph 19 of Ms. Miller's declaration says that, on July 8, 2021, Mr. Brown's time was reduced by five minutes because he "[l]ost track of time." However, her citation for this is page 23 of Exhibit A, which is a July 8, 2021 Compensable Time Record form that actually added time to Mr. Brown's hours. It is likely that Ms. Miller meant to cite to page 22 of Exhibit A, which is a July 12, 2021 Compensable Time Record form that subtracted five minutes because Mr. Brown "[l]ost track of time." This error is ultimately immaterial because it is still true that only six submissions reduced Mr. Brown's time, and four of those were for five minutes or less.

[50] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 19; Ex. A to Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) at 13, 21.

[51] Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶¶ 11–12.

[52] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶¶ 22, 25, 26. In Mr. Brown's declaration, he claims that he was never paid for any overtime after the Spring of 2020. Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 9. However, the Employee Earnings Record shows that he was paid for 9.2 hours of overtime in 2021. Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 26; Ex. B to Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1). Additionally, at the Motion Hearing, Counsel did not dispute that Mr. Brown was paid for overtime in 2021. Sept. 12, 2022 Hr'g Tr. (Rough) at 7–8. While the Court is more lenient to Mr. Brown at this early stage of the litigation, it is not required to blind itself to clearly documented evidence.

Ms. Miller noted that most of Mr. Brown's work was performed on the phone with vendors during normal business hours, and thus the opportunity for him to work overtime was limited.[53] Further, she stated that Mr. Brown typically did not ask to work much, if any, overtime, and that she never received a complaint from Mr. Brown that he was not being paid for his overtime work.[54] Due to on-the-job injuries, he missed work periodically between April 2021 and June 2021, and was out long-term after November 2021 until his resignation in April of 2022.[55]

## DISCUSSION

As explained above, in order to obtain conditional certification, Mr. Brown must make a "modest factual showing sufficient to demonstrate" that (1) he and other potential plaintiffs "together were victims of a common policy or plan that violated the law," and (2) the common policy or plan caused an alleged FLSA violation to the potential members of the defined collective that is similar to the violation to which the named plaintiff has been subjected.[56] On this record, Mr. Brown has failed to make this modest factual showing.

For purposes of the conditional certification decision, it is important for courts to focus on the specific policy or plan that is alleged to be unlawful. For example, in this case no one doubts that there was a common policy (at least for the Central Area) requiring the use of a Compensable Time Record form to memorialize requested adjustments to the worktime recorded by the punch-clock system. But the commonness of that policy is irrelevant, because requiring employees to document time-adjustments on a form is not unlawful. For another example, let's assume there was a general desire of Penske nationally to reduce the amount of overtime worked, thus reducing

---

[53] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 22.
[54] *Id.* ¶¶ 20, 23, 29.
[55] *Id.* ¶¶ 27–28.
[56] *Mitchell*, 2021 WL 7541483, at *3 (citations omitted).

the amount of overtime paid. The commonness of such a policy would also be irrelevant to the conditional certification analysis, because encouraging a reduction in overtime worked to obtain a reduction in overtime costs is not unlawful.[57]

So what is the unlawful common policy or plan alleged in this case? There is really only one potential candidate: It must be the alleged policy or plan to require workers to falsely disclaim overtime hours that they actually worked. But Mr. Brown provides little evidence to suggest there was a common plan or policy of this type.

First, as explained above, Mr. Brown says nothing in his declaration to suggest the false-disclaimer-of-overtime plan came from anyone outside of his particular store.[58] For that inferential leap, Mr. Brown relies on the fact that Mr. Kennington—from a Branch in a different Area—tells a similar story. But at most this shows that two stores (or potentially only two managers) out of a nationwide operation were improperly denying overtime pay. That is just not enough to suggest a common plan or policy at anything above each of the two individual Branches (stores).

Second, even at the individual Branch, there's precious little to suggest a common policy of requiring employees to falsely disclaim overtime. Let's assume Mr. Brown and Mr. Kennington were required by their managers to falsely disclaim overtime. Mr. Brown's and Mr. Kennington's declarations are lacking the details necessary to show how they know others were required to falsely disclaim overtime as well. The declarations state that Mr. Brown and Mr. Kennington knew that other hourly employees worked similar hours to them because they "worked as a team

---

[57] Mr. Brown may be right in his speculation that COVID-19 hindered Penske financially and so Penske attempted to scale back on overtime; and maybe part of that effort included Penske becoming more serious about its timekeeping, which led to a policy requiring time-adjustments to be documented on a form. Pl.'s Br. in Supp. of Mot. for Conditional Certification (Doc. 12) at 9; Sept. 12, 2022 Hr'g Tr. (Rough) at 4. But so what? Mr. Brown needs to show a common policy that (1) is itself an FLSA violation or (2) causes an FLSA violation. The new reporting requirement and the new culture don't fit the bill.

[58] *See supra* pp. 6–8.

and were always communicating and working alongside each other to complete . . . various tasks."[59] The declarations then state that Mr. Brown and Mr. Kennington know that these employees have not received all their overtime pay, and that there are others who would join the lawsuit "[b]ased on [Mr. Brown's and Mr. Kennington's] experience[s] talking with other hourly-paid employees . . . ."[60] Working alongside these other employees may have given Mr. Brown and Mr. Kennington a sufficient basis to conclude that these other employees worked similar hours to them. But there is nothing suggesting the basis for Mr. Brown and Mr. Kennington's belief that these employees were not paid for their overtime work. The declarations merely state that Mr. Brown and Mr. Kennington "talk[ed] with other hourly-paid employees," without providing any details from these conversations that would be useful to the Court.[61]

To be clear, there is nothing in the declarations—such as the relaying of a comment from one of the employees that they were not paid for working overtime—substantiating the claim that these other employees were not paid for such work. Nor do the declarations say that Mr. Brown or Mr. Kennington ever observed other employees filling out Compensable Time Record forms or being disciplined for not doing so. These omissions are particularly troubling in light of the other evidence in the record.

Consider, for example, that Mr. Brown and Mr. Kennington themselves were paid overtime on multiple occasions. If the store (or some higher level) had a common policy of requiring the falsification of time records so as not to pay employees for overtime actually worked, then why were Mr. Brown and Mr. Kennington paid for over 700 hours of overtime collectively over the

---

[59] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 11; Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 11.

[60] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶¶ 12–13; Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶¶ 12–13.

[61] Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 13; Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 13.

It is important to note that Counsel's concession applied even after the onset of COVID-19, which is when he argues Penske's "policy" was at its most aggressive and least flexible.[65] Indeed, even if the inquiry is limited to overtime hours worked after the onset of COVID-19, Mr. Brown was paid for 2.63 hours of overtime in the first quarter of 2020 and 9.2 hours of overtime in 2021, and Mr. Kennington was paid for 81.15 overtime hours in 2020 before his termination at the end of June 2020.[66]  They obviously were not required to reduce their overtime in those instances.  That hardly suggests a common policy.  And if there is no common policy, all that is really left is Mr. Brown's and Mr. Kennington's allegations that on some occasions each of their managers made them falsely reduce their hours.  That'd certainly be an FLSA violation, but it's not a common policy.

Mr. Brown's common policy theory has another problem.  He suggests that he often worked 55 hours a week during this time period.  If there was a common policy of requiring employees to falsely reduce hours via the Compensable Time Record forms, one would expect a bevy of Compensable Time Record form reductions.  But, during this period, Mr. Brown only submitted Compensable Time Record forms that reduced his hours six times, and four of them

---

[65] *Id.* at 3.

[66] At the hearing, Mr. Brown's counsel differentiated between policy "prior to COVID" and policy "once COVID hit[]." *Id.* at 3–4.  There is support in the record for finding that Mr. Brown's and Mr. Kennington's overtime hours reported in 2020 and 2021 occurred after COVID's onset.  In reference to Mr. Kennington's overtime hours, Mr. Rodgers stated that January 2020 through June 2020 "encompass[ed] the height of the COVID-19 pandemic shutdowns . . . ." Ex. 2 (Decl. of Kevin Rodgers) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-2) ¶ 12.  That date range likely includes most if not all the overtime hours Mr. Brown and Mr. Kennington worked in 2020, and certainly Mr. Brown's 2021 overtime hours.  On an extremely liberal reading of the Brown and Kennington declarations, however, the end of Spring 2020 could be the dividing line.  The declarations state that Penske began strictly implementing the policy at "the onset" of COVID-19 "such that [they] know [that they] never received overtime after the Spring of 2020 . . . ." Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 9; Ex. 7 (Decl. of Thomas Kennington) to Pl.'s Mot. for Conditional Certification (Doc. 11-7) ¶ 9.  But this post-Spring 2020 dividing line isn't much better for Mr. Brown or Mr. Kennington.  This is because (1) Mr. Brown still recorded overtime hours in 2021, and (2) Mr. Kennington stopped working on June 26, 2020 (not even one week after the end of Spring), and so it is unremarkable if he didn't receive overtime after the Spring of 2020.

were for five minutes or less. Five minutes or less scarcely rises to the degree of time reduction that Mr. Brown alleges. As for the other two Compensable Time Record forms, they don't seem to be the "mis-punch" type alteration that Mr. Brown is alleging. Rather, these seem to be instances where Mr. Brown forgot to punch out entirely.[67] In any event, the record simply doesn't suggest any common false-reduction-of-overtime policy.

In the end, Mr. Brown has not met the low burden for conditional certification. At absolute best, the declarations potentially show that Mr. Brown and Mr. Kennington (and maybe some others) at their specific stores were not paid for overtime work on some occasions. But that is not the same thing as showing a policy of preventing hourly workers from being paid for their overtime work. This is a case of managerial discretion concerning overtime and potentially the abuse of managerial discretion when it comes to one or a few employees. It is not appropriate for collective treatment.

## CONCLUSION

For the foregoing reasons, Mr. Brown's Motion for Conditional Certification, for Approval and Distribution of Notice, and for Disclosure of Contact Information is DENIED.

IT IS SO ORDERED this 16th day of December 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[67] It is not clear how much time was reduced these two days. Mr. Brown did not punch out on either day, so the correction added a punch out time where there wasn't one before.