## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**LAWRENCE BROWN**                                                                 **PLAINTIFF**

**v.**                              **Case No.: 4:22-cv-00020-LPR**

**PENSKE TRUCK LEASING CO., LP and**
**PENSKE TRUCK LEASING CORPORATION**                          **DEFENDANTS**

### <u>ORDER</u>

This is a wage-and-hour case.  Lawrence Brown brings this action pursuant to the Fair Labor Standards Act (FLSA) and the Arkansas Minimum Wage Act (AMWA).[1]  Mr. Brown seeks to recover unpaid overtime wages, liquidated damages, prejudgment interest, costs, and fees.[2]  Pending before the Court is Penske Truck Leasing Co., LP's Motion for Summary Judgment.[3]  For the following reasons, the Motion is GRANTED.

### BACKGROUND[4]

Penske is a "transportation services provider specializing in full-service truck leasing, commercial and consumer truck rentals, transportation and warehousing management, and supply

---

[1] Compl. (Doc. 1) ¶ 1.  The FLSA and AMWA impose the same overtime requirements and are analyzed in the same way.  *See Helmert v. Butterball, LLC*, 805 F. Supp. 2d 655, 663 n.8 (E.D. Ark. 2011); *Phillips v. Pine Bluff*, No. 5:07-CV-00207, 2008 WL 2351036, at *5 (E.D. Ark. Jun. 4, 2008).

[2] Compl. (Doc. 1) ¶ 2.

[3] Mr. Brown's counsel conceded at the hearing on the Motion for Summary Judgment that Penske Truck Leasing Corporation was not Mr. Brown's employer and thus not an appropriate Defendant.  Sept. 12, 2023 Hr'g Tr. (Rough) at 25–26.  As a result, the Court granted summary judgment in favor of Penske Truck Leasing Corporation.  Order (Doc. 43).  So Penske Truck Leasing Co., LP is the only remaining Defendant.

[4] When a defendant moves for summary judgment, the Court relies on (1) undisputed facts and (2) genuinely disputed facts construed in the light most favorable to the plaintiff.  Essentially, the Court considers the most pro-plaintiff version of the record that a reasonable juror could conclude occurred.  The Court's factual recitation is therefore only good for the summary judgment motion.

The Court recognizes that, if this case went to trial, it would be a bench trial.  But the Court believes that, at the summary judgment stage, it is still appropriate to analyze the issues using the familiar reasonable juror standard.  At a minimum, it is a useful fiction to employ.

chain management solutions, among other things."[5]   Mr. Brown worked as a maintenance coordinator for Penske from June of 2017 until April of 2022.[6]   Mr. Brown's duties included ordering, receiving, and moving parts, doing inventory, scheduling maintenance for and meeting with customers, and completing related paperwork.[7]   Mr. Brown was hired by, and reported directly to, Karen Miller.[8]   Ms. Miller was the District Finance Manager for Penske's Little Rock District.[9]

Mr. Brown was classified as a non-exempt employee under the FLSA and was normally scheduled to work eight-hour shifts five days a week.[10]   (The specific days of the week varied.[11]) As a general matter, each week he recorded about forty hours and was paid for that time.[12]   During his tenure, he did record some overtime and was paid for the recorded overtime.[13]   Mr. Brown was paid for a total of 100.23 hours of overtime in 2019, 2.63 hours in 2020, and 9.2 hours in 2021.[14] Mr. Brown is pressing two distinct, although not completely unrelated, theories of liability.   The Court will address each in turn.

---

[5] Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 2.  *See also* Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts (Doc. 32) at 1.

[6] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 8.  Although Mr. Brown's initial title was service administrator, his title later changed to maintenance coordinator.  *Id.* at 9.  His job duties, however, remained the same.  *Id.*

[7] *Id.* at 9–10.

[8] Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 8.

[9] *Id.* ¶¶ 1, 8.

[10] *Id.* ¶ 10; Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 32) at 7.

[11] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 19 (Penske "had me work, maybe, a Saturday or something every now and then[,] [but] [t]he schedule kept changing all the time . . . .").

[12] *See* Ex. 1 (Employee Earning Records) to Defs.' Mot. for Summ. J. (Doc. 25-1) at 6–23.

[13] *See id.*

[14] Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶¶ 11, 13–14.

## I.     Mr. Brown's General Claim of Unpaid Overtime

Mr. Brown says that, for the period from around June of 2020 until November of 2021, he repeatedly worked overtime for which he was not paid.[15]   Specifically, he alleges that Penske managers regularly asked him to stay at work and complete various tasks after he had already clocked out for the day.[16]   And he alleges that, when they did so, they knew he was already clocked out.[17]   For example, Mr. Brown testified in his deposition that:

> The overtime that I usually did not get paid for[] was when I clocked out at my scheduled time[,] and I would be walking out to my truck and Terry or, at that time, Justin was there, they were maintenance managers, or either Jeffrey, which was the branch service manager; when one of those said, [h]ey, I need this done, I need help with this—because I was the only one whenever—before James was there.  And when he got furloughed, I was left, again—alone doing everything, again.[18]

Mr. Brown also testified that, when asked to work overtime, he specifically raised the fact that he had already clocked out.[19]   Mr. Brown says that, in response to his concerns, the managers who asked him to work overtime told him to not "worry about it" because they would "take care" of getting his overtime hours approved.[20]   But, after a couple of months, Mr. Brown noticed his paycheck did not reflect the overtime hours he had supposedly worked.[21]

---

[15] Mr. Brown says in his deposition that Penske's managers started to ask him to work off the clock "[p]robably just about a month or two before" the implementation of what this Order refers to as the Compensable Time Form regime. *Id.* at 142.  As explained in more detail later in this Order, the implementation of this regime started in June of 2020. So, this would mean these overtime-work requests began, at the earliest, in April of 2020.

[16] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 15–16, 26–29, 39–42, 44–61, 69–72, 119–20, 123–33, 136–41. Mr. Brown testified that "[f]or a long while, . . . [it] was just about every . . . day . . . ." *Id.* at 48.

[17] *See id.* at 40, 123.

[18] *Id.* at 15–16.

[19] *See id.* at 40, 123.

[20] *Id.* at 40, 44–45, 123, 136.

[21] *Id.* at 45.

According to Mr. Brown, the overtime tasks that he performed included checking-in and stocking inventory, cleaning up the shop, fixing things, replacing tags, barcoding tires, and getting parts from vendors.[22]  His testimony isn't that he did each of these things every day, but rather that he usually did one or more of these activities each day that he worked overtime.[23]  He acknowledges that different tasks took him different amounts of time, and he cannot pinpoint which tasks he did on any specific days or dates.[24]  His estimates of how much overtime he worked each week have varied over the course of this litigation.[25]

In his Complaint, Mr. Brown did not provide an estimate of uncompensated overtime worked.  Instead, he alleged more generally that the "Defendant regularly required [him] to work over 40 hours in a week . . . ."[26]  In a declaration supporting his Motion for Conditional Certification, Mr. Brown swore (under penalty of perjury) that he "often work[ed] up to 55 hours per week."[27]  That's fifteen hours of overtime per week.  But in his deposition, his estimate of overtime hours changed drastically.[28]  Although his deposition testimony came off as tentative, uncertain, and somewhat internally inconsistent, ultimately it appears that his current overtime estimate is between thirty minutes to one hour per day, every day, from around April or May of 2020 through November of 2021:[29]

---

[22] *Id*. at 47–55.

[23] *See id*.

[24] *See id*. at 46–59.

[25] *Compare* Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 11, *with* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 46, 48–49.

[26] Compl. (Doc. 1) ¶ 33.

[27] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 11.

[28] *Compare id*., *with* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 46, 48–49.

[29] *Id*. at 46, 48–49.  As stated in note 15 *supra*, Mr. Brown tentatively estimates that this overtime work started in April or May of 2020.  He is clear, however, that this overtime was being performed by June of 2020.

Q:      So you noticed this after a few months, how many hours a week were you working off the clock?

A:      I mean, mostly, it was about an hour or so.  That was on average, about an hour or so, an hour and a half, two hours, three hours would be the max.  Because that was, like, whenever we had issues with the vendors where they didn't get all their stuff out here.

        Like, there was a few instances where the vendor had an accident and they had to offload all the stuff on it to another truck and then it got here late.  The shop needed parts off of that pallet and they weren't very good at receiving-in parts.  So that's when Jeffrey and them would just ask, you know, [c]an you please just help us with this, at least check it in?  And, I'm, [y]eah.

        If I'm just checking it in, it usually takes about an hour on that many parts.  If I'm checking it in and putting it up, it usually takes up to three hours.

Q:      Tell me what the difference is between checking-in and checking-in and putting-up.

A:      So checking-in is barcoding all the parts.  So you're checking inventory, seeing how much is actually there, and looking at the bill of lading and seeing that—everything is supposed to be matching up.

        So anything that we order, if it's approximate or under or over, then we would report that.  And then we would scan everything in, barcode everything, and that's how it gets scanned out with the techs.

        So a tech would scan the barcode that they're going to be using and it would charge that customer or that truck for that part.

Q:      Okay.

A:      And then, me putting it up, would be after it's barcoded, getting the parts to all the techs that they are supposed to be using right then—that they are waiting on off of that pallet.  After that, I would go and actually put up all the parts.  That would be filters, just one filter, we could have like 15 or 20 of them, just one filter.  And we have, like, over seven, eight filters.

Q:      So you're, like, stocking, you're putting it, literally, like, on a shelf?

A:      Yes.

Q:      Okay.

A:      Like, literally, on the shelves.

Q:      And so you said, checking-in.  And if it was just checking-in, that would be about an hour?

A:      Yeah, about an hour or so.

Q:      And then if you checked-in and put up—parts up, what was that?

A:      About—up to, about, three hours.  Yeah, sometimes I stayed until about 8:00, 8:30.

Q:      So between one to three hours a week, was it every week?

A:      For a long while, yeah.  It was just about every—every day I would stay after at least 30 to an hour.  That was minimum staying after, like, 30 minutes to an hour.  And there were some days where I had appointments and things that I had to go to right after work so I would leave at my actual time.  But there was mostly—I would stay over 30 to an hour every day, almost.

Q:      Okay.  So I'm a lawyer, I'm not great at math.  But earlier you said, I believe, that was an average of one to three hours a week—off the clock hours?

A:      Uh-huh.

Q:      But if you stayed over every day 30 minutes to an hour—

A:      Yeah.  So if I stayed—like, if I literally—well, it was a day—it was a day—like, one to three hours a day.  But sometimes, some weeks, it would only be, maybe, three or four hours for the whole week.  But a lot of the weeks, I literally, stayed 30 minutes to an hour each day.

        So if I stayed, let's say, five days, 30 minutes or, you know, an hour, that would be five hours, if I stayed an hour.  But if I stayed just 30 minutes, that would be, you know, two-and-a-half, three hours.

Q:      So your estimated time that you worked off the clock every week, would be two-and-a-half to five hours?

A:      Yeah, somewhere in there.

Q:      And other than checking-in parts or checking-in and putting-up parts, what type of work were you doing off the clock?

A:      There's tire—so I also did tires, as well.  The shop does not really do tires as far as barcoding and things.  We had a specific system that we went by.  If you didn't barcode a tire correctly it can screw up a lot—because we've had many issues with tire inventory being off.  I mean, just one tire can be, like, $800.  And we have over 75, 90, to 140 tires out there.

Q:      So you would barcode tires?

A:      Yes.  Yeah, we would barcode tires.  And they had to be in a package sealed for weather and things like that, rain, and all that.  And a lot of times when they did it, they didn't, they just stuck it on there.

Q:      Who is "they"?

A:      The techs or the management that's in the shop.  They would, literally, put it on there, roll it out there, and it would be on the wrong tire.  So instead of having steel, which is, like, a $60 rim, there's a $375, you know, aluminum wheel.  So they would sometimes mismatch the tires and all that.

        So it was made to where service admin could only do that period, after a while.  Because they'd gotten so complex.  We had to do tire inventory, literally, almost every day because they would mess it up.

Q:      The techs would?

A:      No, we would.  And that's where sometimes I'd have to stay after.  The techs would mis[-]tag or either not tag or—

Q:      Right.

A:      —you know, tag it wrong.  We would have to—

Q:      "We" being—

A:      Service admin, me, yeah . . . .

Q:      —maintenance coordinator?

A:      Yeah.  I would have to go out and fix it.  And we had two shops at that time within the same inventory, that's why it's so many tires.  It's Ace, which is another shop that we use—it's another customer, and we have inventory over there.  So I would have to correlate with that shop, and then my shop that I'm working at, and match up; because it's all one inventory, they're not separate.  So that's why it was so complex.

Q:      Okay.  Other than tires and checking-in parts or checking-in and putting-up parts, what else did you do off the clock?

A:      I mean, basically anything.  Anytime we had an inspection, like, a fire inspection or either OSHA or either corporate would be coming, we would actually stay over a little and work on cleaning up the shop, fixing things, replacing tags that, you know—like, on fire extinguishers, bringing everything up to code.

Q:      How often did you guys have fire inspections?

A:     That was, like, maybe—well, the fire inspections probably, like, once a year—

Q:     What about OSHA?

A:     —once or twice.  I don't know.  I think we just—whenever corporate was coming, we just made it OSHA approved, is what it is, I think.  That's what I'm calling OSHA, because everything we did was to get up to standard to OSHA.

Q:     And when you say "corporate visit," what does that mean?

A:     Like, corporate office.  Like, our managers from corporate office, the regionals, and all them—whoever would come down, like, Eric or something like that.

Q:     Who is Eric?

A:     I don't know actually his title.  But he's, I think, he works in, maybe, the Houston area or something like that.  But he's over most of the Penske's, as far as, like, I don't know, certain departments—or something he's doing, I can't remember.  But he's higher up.

Q:     So how often did corporate visit the Little Rock branch?

A:     Maybe, three times a year, maybe four.  It just depends on when they come.  That store—that location was considered the Center of Excellence.  Which means, we trained people from, you know, from all over.  They come and they train with us.  And they sit in our classes and do it up there.  I mean, they would come and check and make sure that we're doing everything appropriately and everything.

     There was a few times when we actually got that title taken away from us because certain things weren't being done right.

Q:     All right.  You said, checking-in parts, checking-in and putting-up parts, inventory, tire inventory, and then some cleaning up, bringing up to code for inspections or corporate visits; what else did you do off the clock?

A:     I had to go and actually get parts from the vendor.  When it was an emergency, they would say, [h]ey, I need you to go and get this part; I've got a part that's, you know, needed right now for a customer, we need to use it.

Q:     Are you talking in Little Rock or in central Arkansas?

A:     Yeah, it's in North Little Rock—usually is where it's at, or either Benton.

Q:     And how often would that happen?

A:     That happened quite often because they are always needing parts . . . .

8

. . .

Q:      Okay.  So I'm talking about right now—and we're talking about after this and you're talking about the off the clock work that you did—

A:      Yeah.

Q:      —at Terry, Jeffrey and/or Baron's instructions?

A:      Yeah.

Q:      How often would you go to a vendor?

A:      That, quite often.  Matter of fact, James Burrough did the same exact thing. He and I complained about that a lot.

Q:      So what is "quite often"?

A:      I mean, we had to go get parts almost every day.  Most of the time it was during the day or during our shift.  But there was quite a few instances where—I would say, maybe, twice a week.

Q:      Where you did it off the clock?

A:      Yeah, did it off the clock.  And we used our rental vehicles to do that or either I ran in my own truck.  Depends on if rental was there or not or if I could get a rental.  Because I didn't want to drive a 24-foot box truck to go get a part.  So I would take my own truck.

Q:      And you said that's usually in North Little Rock or Benton?

A:      Benton, yes.

. . .

Q:      So when you took your own truck off the clock to pick up at a vendor, did you ever submit a request for mileage?

A:      No.

Q:      Why not?

A:      I mean, that was mainly the thing that, you know, we all kind of did.  At that time we were just, like, the shop needs a part, I'll just run and get it.  That's what it was and that's how it was, that the shop needed it.  Because there was so much tension between the department—between the shop, the maintenance side and service admin side.  I was trying to help out as much as I could there between them two on that note whenever I took my own truck.  And that was—they needed

the part right now, I need it, okay, that's fine.  I'll just go and get it.  And so that's when I would just jump in my truck and head out.

Because there's—sometimes a customer that would be irate and really upset because it's taking so long and we hadn't even got to the truck yet.  But then when they finally get to the truck and they're working on it, they see the problem and it's late at night and it's about to close—so, like, Summit Truck Group, they close pretty early, like, at 5:00 and, you know, 6:00; so I would have to run up there real fast before they closed.

Q:      What time does your parts department—did the parts department at the Little Rock branch close?

A:      What do you mean?

Q:      Was there a close time?  Did they end, you know, did they stop working, like, the techs in the shop?

A:      No.  I mean, the techs, I think the shift stops at 11:00 at night.

Q:      So the parts department is open until 11:00?

A:      I mean, they can come—it's free-range, they can come in and out of there all day.  That's how they get their parts to scan it.  So if we're not there, they can scan it.  But if it's not received, then that's where we have a lot of issues.  That's why management in the shop usually had me stay after to scan them in because they would just come in and take parts and not scan them into the system.

Q:      So what about the—when you say "shop," is that the same thing as—

A:      Maintenance techs.

Q:      —the shop, are you talking about the service department?

A:      Yes.  Service department.

Q:      What time did the service department close?

A:      Yeah, they close at 11:00.  Like, the whole building closes at 11:00.

Q:      All right.  So check-in parts, check-in and put-up parts, tire inventory, your fire corporate visit inspection—

A:      Yeah.

Q:      —type of— . . .

A:      I usually did a whole lot with that.

Q:      —get parts from vendor.  So not—wait, I thought you said fire was, like, once a year—

A:      Yeah.

Q:      —OSHA was— . . .

A:      Yeah, I usually deal with all of that, though.  I'm usually the one that helps the shop actually and service admin get all of that together and put up on the walls and all that and clean and all that.  I'm usually the one doing that for them.

Q:      And that was fire—at least fire, you said, once a year?

A:      Yeah.

Q:      OSHA, you don't know?

A:      I mean, OSHA, I don't think they've ever actually came but, maybe, once, if they ever came.  It was whenever corporate would come down, we did all the OSHA stuff.

Q:      And that was three or four times a year?

A:      Yeah.  Like, two, three, four times, depending on what year it was.

Q:      And then you got parts from vendors.  What other work did you perform off the clock?

A:      I mean, that's about it.[30]

Mr. Brown never submitted a Compensable Time Record Form for these purported overtime hours.[31]  He says that's for two reasons.  First, as discussed above, he says the managers who asked him to work overtime led him to believe that they would take care of getting his overtime hours paid.[32]  Second, he says the Compensable Time Record Forms were not used to log overtime hours, but only used for things like mis-punches on the time clock.[33]  Specifically, he testified that, "when they're telling me to work over, that's not me fixing the time, that is

---

[30] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. For Summ. J. (Doc. 31-1) at 46–59.

[31] *See id.* at 119–20.

[32] *See id.* at 40, 44–45, 123, 136.

[33] *See id.* at 125–26.

overtime[,]" and "[t]hat's not what this was for as far as I'm concerned—is what we all understood."[34]

There were a few times in 2020 (before June) when Mr. Brown reported working a few specific overtime hours via email to his direct supervisor, Ms. Miller.[35]  Mr. Brown concedes that Penske paid him for those hours.[36]  Mr. Brown did not report specific overtime hours to Ms. Miller with respect to the purported overtime work he allegedly performed at the request of the service or maintenance managers.[37]  He says he didn't report specific hours to Ms. Miller because the managers "said they would be the ones fixing it and getting it done for [him]."[38]  He also notes that he did (more generally) mention to Ms. Miller that he was working unpaid overtime hours at the request of those other managers.[39]  Mr. Brown recounted Ms. Miller responding as follows:

> [I]f the problem persists, you know, come and talk to her.  And I said, [o]kay.  And so I told her, you know, [w]ell, they ask me all the time to stay over and I do.  And because, basically, I don't—I didn't have a specific time, you know, in days, where I did that, because I didn't keep a journal at that time or nothing of dates—and I'm really bad, like I said, with time and dates.  She was, like, [w]ell, I mean, there's nothing really I can do at that time.  There's no specific day that I can give you credit for, for working over.  She said, [i]f you can tell me, then, you know, I can look back and see.  But I couldn't, I couldn't really come up with a day.[40]

---

[34] *Id*. at 126.

[35] *Id*. at 60–61.

[36] *See id*. at 61.

[37] *Id*.

[38] *Id*.

[39] *Id*. at 61–62.

[40] *Id*. at 63.  Karen Miller says in her Declaration that she "never received a complaint from Mr. Brown that he had worked overtime and was not compensated for that time."  Ex. 1 (Decl. of Karen Miller) to Defs.' Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 29; Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 22.  At this stage of the litigation, the Court has to take Mr. Brown's side of that dispute.

After this conversation, Mr. Brown says he began to keep a journal of the off-the-clock work he performed.[41]  But this journal is not part of the record in this case.  Mr. Brown claims that, at some point, his journal went missing.[42]

According to Mr. Brown's testimony, at some point, he more forcefully pushed back on requests to work overtime with one of the overtime-requesting managers, Terry.[43]  That manager got upset and threatened to write Mr. Brown up.[44]  Mr. Brown testified that the branch service manager, Jeffrey Rickard, even told Terry to stop requesting that Mr. Brown work after Mr. Brown had already clocked out.[45]  But, according to Mr. Brown, Terry's requests kept coming.[46]  When Mr. Brown again raised the issue of these continuing requests with Mr. Rickard, Mr. Rickard asked him, "is it going to kill you?"[47]

The foregoing is, for all intents and purposes, the breadth of the record concerning Mr. Brown's first theory of liability.  Mr. Brown did not depose any witnesses.  And he did not submit any declarations from his coworkers at Penske's Little Rock branch.  Essentially, aside from Penske's time records showing around forty hours of work in most weeks, Mr. Brown's general overtime claim stands on his testimony alone.

---

[41] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. For Summ. J. (Doc. 31-1) at 64.

[42] *See id.*  In any event, Mr. Brown's testimony suggests the notebook would be less than helpful to him.  When asked in his deposition if he kept a journal, Mr. Brown's answer was "I tried, I really did try.  I did for a little bit.  But then, right in the middle of all that, I, kind of, just stopped.  I don't know why I did that."  *Id.*

[43] *See id.* at 27, 66.  The record does not reveal Terry's last name.

[44] *Id.* at 27.

[45] *Id.* at 67.

[46] *Id.* at 67–69, 126–27.

[47] *Id.* at 67.

## II.    Mr. Brown's Claims of Falsified Time Records

Mr. Brown says that, in or around June of 2020, Penske implemented a practice of requiring its hourly employees to falsely sign time-adjustment forms stating that any hours recorded over forty were a mis-punch on the time clock.[48]  Mr. Brown testified that, if the employees refused to sign the form, they received a disciplinary write-up; and three write-ups led to termination.[49]

As briefly mentioned above, hourly employees were required to clock in and out of work. Some, including Mr. Brown, were required to do so on a wall-mount digital time clock.[50]  Until June of 2020, modifications to these time punches were made informally through oral or written requests to payroll.[51]  However, at the direction of Penske's Central Area Human Resources department, Penske started requiring hourly associates to submit a signed Compensable Time Record Form for all requests for adjustments to their recorded work time.[52]  Mr. Brown asserts that the Compensable Time Record Form was a ruse used to enforce Penske's new desire to strictly limit overtime pay.[53]

Specifically, Mr. Brown testified that, sometime around the onset of the Covid pandemic (i.e., spring of 2020), Penske's District Service Manager, David Boone, instructed Mr. Brown to

---

[48] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 8; Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 108–09.

[49] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 8.  *See also* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 74, 92–93, 96, 98, 112, 117, 121.

[50] Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 7.  According to Ms. Miller, this is not the case for all hourly associates.  She estimates that about half of the hourly employees record their time using a computer in the shop rather than a timecard.  Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 13.

[51] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 14; Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 5.

[52] Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶ 15; Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 6.

[53] *See* Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 8.

not work any overtime hours unless those hours were approved.[54]   This was a change from Penske's pre-existing practice where, if employees "needed to work overtime[, they] just let [Penske] know[,] and it would just get approved."[55]   According to Mr. Brown, getting overtime before Mr. Boone's instructions "wasn't anything major[, and] [t]here wasn't any real policy on overtime as far as [Mr. Brown] kn[e]w because [he and other employees] were able to get it."[56]

Between the implementation of the Compensable Time Record Form regime around June of 2020 and his last day at work in November of 2021, Mr. Brown submitted a total of twenty-two forms.[57]   Sixteen forms added time.[58]   Time was added for various different reasons, including clocking out too early by mistake, failing to clock back in after lunch, being offsite, and waiting on Covid-related testing.[59]   Except for one week, the time added by way of these forms never put

---

[54] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 29–31, 33–35. According to Mr. Brown, there were at least two occasions on which Mr. Boone instructed him not to work unapproved overtime hours.  The first occurred in a small meeting with Mr. Boone, Ms. Elkins, and Mr. Brown present.  *Id*. at 29, 31–33.  There, Mr. Boone informed those who were present that, if overtime hours were not approved, the employee claiming them would "lose" those hours.  *Id*. at 33–34.  Although Mr. Brown, at one point, says in his deposition that this meeting happened "maybe nine, ten months before [the Covid pandemic], almost a full year before[,]" this is totally incongruous with the rest of his testimony and the remainder of the record.  *Id*. at 29–30.  "[A]lmost a full year before" the Covid pandemic puts us in spring of 2019.  *See id.*  But, as Mr. Brown testified in an earlier declaration, his problems getting paid for overtime arose in the spring of 2020.  *See* Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶¶ 8–9.  Indeed, the fact that he was paid for over 100 hours of overtime in 2019 shows as much.  *See* Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶¶ 11, 13–14.  Given these facts, Mr. Brown's assertion that the first meeting with Mr. Boone could have happened as early as spring of 2019 makes absolutely no sense.  He must mean spring of 2020.

The second occasion occurred in a larger group meeting out on the floor of the shop.  *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 33–34.  Mr. Boone again announced that there would be no overtime without approval.  *Id*.  It is not clear that, in either of these situations, Mr. Boone was directing his complaints personally or exclusively towards Mr. Brown.  But Mr. Brown was present for these comments, which were applicable to all hourly employees.  *Id*. at 31–34.

[55] *Id*. at 38.

[56] *Id*.

[57] *See* Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 114, 116–36.  Mr. Brown also sent an email to Julia Elkins on June 21, 2020, asking her to "put [him] at 40 h[ou]rs[]" because he "miscalculated what time [he] needed to punch out to make 40 h[ou]rs."  *Id*. at 115.

[58] *See id*. at 114, 116–21, 123, 125, 127–29, 131–33, 136.

[59] *Id*.

Mr. Brown over forty hours worked in any given week.[60]  When asked in his deposition about the forms adding time, Mr. Brown testified that "[t]hey are not true statements all the time . . . [b]ecause sometimes I even just sign it and give it to them and say, [y]ou make it up."[61]  But he later conceded that "some of these . . . , to [his] knowledge, are true statements . . . because otherwise [he] wouldn't get paid for the rest of the day."[62]

Six of Mr. Brown's Compensable Time Record Forms requested a reduction in time.[63]  Mr. Brown concedes that two of the reduction requests were legitimate because he failed to clock out.[64]  The other four forms reduced Mr. Brown's time by a total of seventeen minutes.[65]  The first of these forms—dated November 2, 2020, and adjusting time for October 31, 2020—reduced Mr. Brown's hours by five minutes for a "mis[-]punch 5 min[.]"[66]  Mr. Brown conceded that he filled out the relevant portion of the form (stating there was a five minute mis-punch) and signed it.[67]  However, he went on to suggest that he did not fill out the actual specific time adjustment: "I don't know nothing about these.  I mean, I do whatever—I don't even fill this part out, I do this down here.  She tells me, [h]ey, just do this, and I'll just fix the time . . . because here's the thing,

---

[60] *See* Sept. 12, 2023 Hr'g Tr. (Rough) at 48; Ex. 1 (Employee Earning Records) to Defs.' Mot. for Summ. J. (Doc. 25-1) at 23.

[61] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 86.

[62] *Id*. at 94.

[63] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 122, 124, 126, 130, 134–35.

[64] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 98, 103.  To be clear, with respect to these two forms, Mr. Brown seems to mean that he agrees he should have been clocked out at some point that day.  His agreement should not be taken as a suggestion that he didn't work uncompensated overtime those days (i.e., his general unpaid overtime theory).

[65] *Id*. at 122, 124, 130, 135.

[66] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 122.

[67] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 91–92.

this right here, it doesn't matter to me.  It didn't matter to anybody.  The reason why is, if we didn't sign it, we would be getting written up."[68]

The next form was dated November 23, 2020, and it reduced Mr. Brown's time for November 20, 2020.[69]  Mr. Brown filled out and signed the form, which stated that the reduction was "to correct time due to having to leave early one day that week."[70]  Mr. Brown acknowledged that the form was filled out in his handwriting and contained his signature.[71]  He does say that "after this" one, Julia Elkins, a service administrator for Penske, told him "just don't put anything in there, I'll put something in there or fill it out."[72]

On April 19, 2021, Mr. Brown submitted another Compensable Time Record Form, this one reducing his time by four minutes.[73]  The form did not include any reason for the reduction, but it did contain Mr. Brown's signature.[74]  Mr. Brown says he did not include a reason because "a lot of these [Compensable Time Record Forms] were just where I signed it and [Julia Elkins] does it."[75]

Mr. Brown's final Compensable Time Record Form on July 12, 2021, reduced his July 7, 2021 hours by five minutes because (according to the reason provided on the form) he "lost track of time[.]"[76]  Mr. Brown's only relevant testimony in his deposition about this form was that it's

---

[68] *Id*. at 92.

[69] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 124.

[70] *Id*.  *See also* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 94–95.

[71] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 95.

[72] *Id*.

[73] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 130.

[74] *See id*.; Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 100.

[75] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 100.  Mr. Brown's testimony uses "she" instead of Julia Elkins.  He does not specifically state who "she" is.  But, based on his earlier testimony in the deposition, the Court assumes he is talking about Ms. Elkins.

[76] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 135.

"probably" his handwriting and that he was the one who signed it.[77]  He does note that, "[i]f you look at the date and look at everything on there, it coincides—it's always a Sunday, Monday, when a lot of these are made."[78]  This statement about the July 12, 2021 Compensable Time Record Form seemingly refers back to his earlier testimony that:

> I don't really know exactly what partaked [sic] on that day, that's what I'm trying to tell you.  As a whole, as an idea—I'm needing you to grasp this—this was an operation that was—it was put there, just to try to say, [h]ey this is the way to correct this time to put you back at 40 or either add a little bit of time.  These would add times.  But there is some that's in there, that at the end of the pay period—or beginning—or, yeah, at the end of the pay period, they would submit these and make us—have it where they changed the time to make it to 40.[79]

Overall, Mr. Brown testified to some purported shenanigans with the forms.  For example, he testified generally that Penske, not he, put the times and reasons on the forms, and he only "signed the form[s] because that's what [he] was told to do."[80]  For another example, Mr. Brown testified that "there [are] a lot [of Compensable Time Record Forms] missing, actually."[81]  This portion of his testimony has one global point:  the forms, whether adding or subtracting time, were really used by Penske to ensure a paper trail that would avoid paying for overtime.

That's the state of the record with respect to Mr. Brown's second theory of liability.  Again, Mr. Brown did not depose any witnesses.  And he did not submit any declarations from his coworkers at Penske's Little Rock branch.  Essentially, aside from the Compensable Time Record Forms, Mr. Brown's falsification-of-records claim stands on his testimony alone.

---

[77] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 103.

[78] *Id.*

[79] *Id.* at 89–90.

[80] *Id.* at 121.

[81] *Id.* at 104.

### III.    The End of Mr. Brown's Tenure with Penske

Mr. Brown sustained an on-the-job injury in April of 2021 and was off work periodically on approved absences until June of 2021.[82]  He worked under light-duty restrictions from mid-June of 2021 until mid-September of 2021.[83]    Following an approved leave of absence in mid-September of 2021, Mr. Brown returned to light-duty desk work on September 24, 2021.[84]  He remained under that restriction until November 11, 2021.[85]  On November 11, 2021, Mr. Brown was deemed unable to work due to a blood clot, which led him to take another extended leave of absence.[86]  That was his last day of actual work.[87]  But he formally resigned from Penske about five months later, on April 6, 2022.[88]

During the June 2021 to November 2021 time period, Mr. Brown concedes that he worked "a lot less" off-the-clock time than usual.[89]  He does not say how much less.[90]  During at least part of this same time period, Mr. Brown acknowledges that there were a significant number of times he left work during his normal eight-hour shift to go to physical therapy.[91]  That therapy took about an hour or an hour-and-a-half.[92]  We do not know how many days a week he went to physical

---

[82] Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 15.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] Ex. 3 (Verified Interrog. of Lawrence Brown) to Defs.' Mot. for Summ. J. (Doc. 25-3) at 12.

[87] Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 15.

[88] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 8.

[89] *Id.* at 144, 146.  *See also* Sept. 12, 2023 Hr'g Tr. (Rough) at 42–43.

[90] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 144, 146; Sept. 12, 2023 Hr'g Tr. (Rough) at 43.

[91] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 147–48.

[92] *See id.* at 147.

therapy.  What we do know is that he was paid by Penske for that time even though he wasn't working.[93]

## DISCUSSION

"Summary judgment is only proper where the evidence, viewed in the light most favorable to the nonmovant, shows that no genuine issue of material fact exists, such that the movant is entitled to judgment as a matter of law."[94]  "There is no genuine issue of material fact when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party."[95]  If the moving party makes such a showing, the nonmoving party must then present "specific facts, by affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial."[96]

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[97]  Whether there is a material dispute of fact "rests on the substantive law[]" because "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."[98]  There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[99]

### I.    Breadth of Claim

As a threshold matter, Penske argues that Mr. Brown's overtime claim is limited to his falsification-of-records theory.[100]  Penske contends that Mr. Brown's broader theory concerning a

---

[93] *See id*. at 147–48.

[94] *Zimmerli v. City of Kansas City, Mo.*, 996 F.3d 857, 862 (8th Cir. 2021) (quotation marks and citations omitted).

[95] *Id*. (cleaned up).

[96] *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[97] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).

[98] *Id*. at 248.

[99] *Id*.

[100] *See* Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) at 16–17; Defs.' Reply to Pl.'s Resp. to Defs.' Mot. for

general denial of overtime compensation was not pled in his Complaint.[101]  Penske is right on the law, but wrong on the facts.  A plaintiff cannot manufacture new claims at the summary judgment stage.[102]  But that's not what happened here.

In addition to specific allegations about the falsification of Compensable Time Record Forms, Mr. Brown's Complaint pled that he "regularly worked hours which went unrecorded and uncompensated[,]" and that Penske "regularly required [him] to work over 40 hours in a week or assigned him so much work that he was unable to complete his weekly work in 40 hours or less."[103]  It is true that one reasonable reading of the Complaint is that this broader language was merely introducing the specific falsification-of-records claim.  But that is not the only plausible reading of the Complaint.  While the Complaint is not a model of clarity (as Mr. Brown all but concedes[104]), it is not a big stretch to read its language as raising both a specific falsification-of-records claim and a general unpaid overtime claim.  And, given the quite liberal pleading standards in the Federal Rules, the Court reads the Complaint in this way.

A complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests' . . . ."[105]  By pleading that (1) he regularly worked hours that went uncompensated and unrecorded, and (2) that Penske regularly required him to work more than forty hours a week, Mr. Brown's Complaint gives Penske fair notice of his broader and more general denial-of-overtime-compensation claim.[106]  This claim is separate and distinct from the

---

Summ. J. (Doc. 33) at 2–4.

[101] *See id.*

[102] *See Wendt v. Iowa*, 971 F.3d 816, 821 (8th Cir. 2020) (quoting *Singleton v. Arkansas Hous. Auth. Prop. & Cas. Self-Insured Fund*, 934 F.3d 830, 837 (8th Cir. 2019)).

[103] *See* Compl. (Doc. 1) ¶¶ 28, 33.

[104] *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31) at 16.

[105] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).

[106] *See* Compl. (Doc. 1) ¶¶ 28, 33.

more specific claim that Penske required Mr. Brown to falsely sign a time-adjustment form stating

that any hours recorded over forty were a mis-punch on the time clock.  Thus, Mr. Brown has not

raised a new claim.  Penske had notice from the Complaint of both the general denial-of-overtime

claim and the specific Compensable-Time-Record-Form-scheme claim.[107]

## II.    Mr. Brown's General Claim of Unpaid Overtime[108]

Both the FLSA and the AMWA require employers to pay employees no less than one-and-

a-half times the employees' regular rate of pay for overtime work.[109]  Under both statutes, to

establish a claim for unpaid overtime, an employee must "show (1) that [he] has performed

compensable [overtime] work and (2) the number of hours for which [he] has not been properly

paid."[110]  Often, the action in overtime cases concerns how an employee can go about proving

these two things.  This case is no exception to that general rule.

The FLSA requires employers to track and record their employees' time.[111]  Consequently,

where "an employer has failed to keep records," an employee's denial-of-overtime-compensation

---

[107] *See Hamilton v. Palm*, 621 F.3d 816, 818 (8th Cir. 2010) ("Determining whether a claim is plausible is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (internal quotation marks and citations omitted).  It is also worth noting that Penske concedes that, at least by January 20, 2023, it was on notice that Mr. Brown was pressing the broader theory.  *See* Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) at 10–11, 16; Ex. 3 (Verified Interrog. of Lawrence Brown) to Defs.' Mot. for Summ. J. (Doc. 25-3) at 5–6; Sept. 12, 2023 Hr'g Tr. (Rough) at 12–13.  And Penske concedes that it would not be prejudiced by allowing this theory to be pressed.  *See* Sept. 12, 2023 Hr'g Tr. (Rough) at 12–13.  Penske has fully addressed the merits of this claim in its summary judgment briefing and at oral argument.

[108] Penske argues that Mr. Brown's claims are subject to a two-year statute of limitations (as opposed to a three-year statute of limitations) because any alleged violations of the FLSA were not willful.  Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 26) at 21–22.  The statute of limitations for an overtime claim under AMWA is also two years.  Ark. Code Ann. § 11-4-218(g).  Mr. Brown filed his Complaint on January 12, 2022.  Compl. (Doc. 1).  At the earliest, Penske's purported overtime violations date back to April 2020.  Thus, Mr. Brown's claims are timely under both the FLSA and AMWA statutes of limitations.

[109] 29 U.S.C. § 207(a)(1); Ark. Code Ann. § 11-4-211(a).

[110] *Hertz v. Woodbury Cnty.*, 566 F.3d 775, 783 (8th Cir. 2009).  It is worth noting that these laws make it unlawful to fail to pay overtime or to fail to pay minimum wage.  These statutes are not implicated in a situation where an employer pays an employee for thirty-nine hours, and the employee actually worked thirty-nine-and-a-half hours, so long as the discrepancy does not push the employee's hourly pay below the minimum wage.  *See generally* 29 U.S.C. §§ 206, 207; Ark. Code Ann. §§ 11-4-210, 11-4-211.

[111] 29 U.S.C. § 211(c).

claim does not fail "simply because [that employee] cannot prove the precise extent of [his] uncompensated work."[112]   In such circumstances, the courts employ "a relaxed evidentiary standard" for employees to establish the extent of uncompensated work.[113]   "[O]nce the employee has shown work performed for which the employee was not compensated, and 'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference,' the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference."[114]

As this Court has said on previous occasions, the relaxed evidentiary standard is about proof of damages, not proof of liability.[115]   To determine liability, an employee must prove by a preponderance of the evidence that he performed uncompensated overtime work.[116]   Specifically, the employee "must show by a preponderance of the evidence that he worked over forty hours in at least one week, that the employer suffered or permitted the overtime, and that he was not compensated properly for the overtime."[117]   It is only after liability is established that the Court

---

[112] *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014).

[113] *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds*)).

[114] *Id*. (quoting *Anderson*, 328 U.S. at 687–88).

[115] *See, e.g.*, *Bean v. Wayne Farms LLC*, No. 4:20-CV-798-LPR, 2022 WL 848345, at *6 (E.D. Ark. Mar. 21, 2022); *Thompson v. DiMichele Enterprises, Inc.*, No. 4:18-CV-00903-LPR, 2020 WL 1285040, at *6 (E.D. Ark. Jan. 3, 2020).   *See also Carmody*, 713 F.3d at 406 ("*Anderson* only applies where the existence of damages is certain. *Anderson* allows uncertainty only for the amount of damages.") (internal citation omitted).

[116] *See Bridgeforth v. New Age Distrib., Inc.*, No. 4:20-CV-917-LPR, 2023 WL 2715077, at *12 (E.D. Ark. Mar. 30, 2023).

[117] *Id*.   Before an employer can be liable for unpaid overtime under the FLSA, the employer must have either known or should have known that the employee was working overtime.   *See Hertz*, 566 F.3d at 781.   As discussed, Mr. Brown says that numerous Penske managers regularly asked him to stay and work after he had already clocked out for the day.   Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. For Summ. J. (Doc. 31-1) at 15–16, 67–69, 139–40.   Even when an employer does not request overtime, "tacit approval" of an employee working overtime may be sufficient to find that the employer had knowledge.   *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997).   It only follows that, when the employer (or its agents) actually requests that an employee work overtime, the employer has knowledge that the employee worked overtime.   *See id*.   Taking these sworn statements in the light most favorable to Mr. Brown, Penske knew or should have known that Mr. Brown was allegedly working overtime.

will consider whether, under the relaxed standard, an employee has provided "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference[.]"[118]

In theory, an employee can satisfy both evidentiary burdens with (among other things) time and pay records, other documentary evidence like texts or emails or cell-phone location records, witness testimony, his own testimony, or a combination of these things.[119] Although corroboration by way of different types of evidence makes a case stronger, there is no hard and fast rule requiring a certain type or amount of corroboration.[120] But when the only evidence of overtime worked is the employee's own testimony, that employee faces a serious risk of summary judgment being granted in favor of the employer.[121] That is because the Eighth Circuit has made clear that an employee's testimony on its own is insufficient to survive summary judgment when it is based on vague, general, inconsistent, and not-meaningfully explained recollections of that employee's daily activities.[122]

Said another way, to proceed to trial with one's own testimony as the only favorable evidence, "[a] plaintiff must provide a meaningful, consistent explanation of the hours the plaintiff claims to have worked[,]" and that explanation "must include 'details [that] would allow a jury to determine' that the plaintiff worked the claimed overtime."[123] A plaintiff can do so by pointing to

---

[118] *Carmody*, 713 F.3d at 406 (quoting *Anderson*, 328 U.S. at 687) (internal quotation marks removed). *See also Bean*, No. 4:20-CV-798-LPR, 2022 WL 848345, at *6 (E.D. Ark. Mar. 21, 2022).

[119] *See Holaway*, 771 F.3d at 1059–60 (internal citations omitted).

[120] *See Thompson*, No. 4:18-CV-00903-LPR, 2020 WL 1285040, at *10 (E.D. Ark. Jan. 3, 2020).

[121] *See Holaway*, 771 F.3d at 1059–60.

[122] *See id.* at 1058–60. *See also John v. Dierks Lumber & Coal Co.*, 130 F.2d 115, 118 (8th Cir. 1942) ("[T]he burden is upon the plaintiff to establish by a preponderance of the evidence the number of hours worked and the amount of wages due; and the evidence to sustain this burden must be definite and certain.").

[123] *Bridgeforth*, No. 4:20-CV-917-LPR, 2023 WL 2715077, at *12 (E.D. Ark. Mar. 30, 2023) (quoting *Holaway*, 771 F.3d at 1060).

"specific dates worked, specific hours worked, or money owed."[124]  "[U]nsupported estimations of the unpaid hours due are not enough."[125]  The foregoing holds true whether the question is one of liability—i.e., was there any non-*de minimis* overtime worked but not paid—or one of damages—i.e., how much overtime was worked but not paid.  For either question, the rules set out above create an absolute floor for a plaintiff's burden on summary judgment.

With respect to his general overtime theory, Mr. Brown has one major arrow in his quiver.  For the time period at issue, Penske's records show that Mr. Brown usually worked either forty hours or extremely close to that figure.[126]  There are a few weeks for which the records show overtime work, and there are a few weeks in which Mr. Brown worked well below forty hours.[127]  But, by and large, the records show a thirty-nine to forty hour work week.[128]  This is helpful to Mr. Brown on the liability question because it means that all he must do is establish a very small amount of unpaid overtime work in one of his usual weeks.[129]  It's less helpful on the damages question because it doesn't tell us how much unpaid overtime he worked.[130]

Mr. Brown's only evidence that he worked any hours beyond those recorded comes from his own testimony.  Mr. Brown could have secured testimony from any of his coworkers who witnessed Mr. Brown work overtime or, more generally, had some knowledge of Penske managers failing to ensure pay to employees for overtime that they requested employees work.  Given Mr. Brown's own testimony that he worked overtime every day (or nearly every day), and his own

---

[124] *Carmody*, 713 F.3d at 407.

[125] *Id*.  The law set out in this paragraph applies for the relaxed evidentiary standard.  The preponderance-of-the-evidence standard might be even harsher to Mr. Brown.  But the Court need not decide that issue.

[126] *See* Ex. 1 (Employee Earning Records) to Defs.' Mot. for Summ. J. (Doc. 25-1) at 6–23.

[127] *See id*.

[128] *See id*.

[129] *See Bridgeforth*, No. 4:20-CV-917-LPR, 2023 WL 2715077, at *12 (E.D. Ark. Mar. 30, 2023).

[130] *See Carmody*, 713 F.3d at 406–07.

testimony concerning the statements made by Mr. Boone to multiple employees, obtaining this corroborating testimonial evidence seems like it would not be hard to do.  Mr. Brown could have deposed (under penalty of perjury) any of the numerous managers who allegedly asked him to work overtime and told him they would "take care" of his hours.  He did none of those things.  He also provided no documentary evidence to corroborate his testimony of overtime worked.

As discussed above, relying on one's own testimony and nothing else carries considerable risk.[131]  It's unclear why an employee would take such a risk if there was any chance that the testimony of others would back up his story.  But, nevertheless, that's where we are.  And the Court is not going to try and guess at the motivations of Mr. Brown's strategic decisions.  Instead, the Court will evaluate Mr. Brown's testimony under the framework established by the Eighth Circuit in cases like *Holaway v. Stratasys, Inc*.[132]  Under that framework, even assuming Mr. Brown's testimony is enough to show liability—i.e., that he worked one non-*de minimis* unit of overtime for which he was not paid—his testimony is not "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference[.]"[133]

*Holaway* is not only instructive, but (on the damages question) it is near well indistinguishable from this case.  In *Holaway*, the Eighth Circuit affirmed summary judgment in favor of the employer because the employee "failed to put forward any evidence of the amount and extent of his work in excess of forty hours a week for any week worked for [the employer], let alone evidence of excess hours worked every week of his employment."[134]  There, Mr. Holaway

> [P]ut forth contradictory and bare assertions of his overtime hours worked.  At various times, Holaway has estimated his work hours as between forty-five and

---

[131] *See Holaway*, 771 F.3d at 1059–60.

[132] *Id.*

[133] *Carmody*, 713 F.3d at 406 (quoting *Anderson*, 328 U.S. at 687) (internal quotation marks omitted).

[134] *Holaway*, 771 F.3d at 1059.

seventy hours a week, yet has failed to specifically account for the hours worked. In fact, Holaway failed to put forth any evidence regarding specific weeks where he worked beyond forty hours.  Holaway has also failed to provide a meaningful explanation of how he arrived at his final estimate of sixty hours a week, every week, of his employment.  Holaway provided only vague testimony and failed to reference specific days and hours worked.[135]

Mr. Brown and Mr. Holaway are not dissimilar.

Consider the delta between Mr. Brown's original, sworn estimate of weekly overtime hours (often up to fifteen hours) and his current estimate (two-and-a-half to five hours).[136]  That's an enormous inconsistency and a red flag with respect to Mr. Brown's memory-based testimony. Moreover, it's not the only problem with Mr. Brown's testimony.  Mr. Brown testified in his deposition that, at the request of numerous managers, he worked "on average, about an hour or so, an hour and a half, two hours, three hours would be the max[]" of overtime "just about . . . every day . . . ."[137]  (Eventually, this morphed into an average of thirty minutes to an hour each day.[138]) These are exactly the type of nonspecific-dates-and-hours estimations that the Eighth Circuit has said are insufficient to establish liability under the FLSA.[139]  When an employee only makes "contradictory and bare assertions of his overtime hours worked[,]" there is no evidence to support a just and reasonable inference of uncompensated time.[140]

---

[135] *Id*. at 1059–60.

[136] *Compare* Ex. 6 (Decl. of Lawrence Brown) to Pl.'s Mot. for Conditional Certification (Doc. 11-6) ¶ 11, *with* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 49.

[137] Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 46, 48.

[138] *Id*. at 49.

[139] *See Holaway*, 771 F.3d at 1059–60; *Carmody*, 713 F.3d at 407.

[140] *Holaway*, 771 F.3d at 1059.

The employee in *Holaway*, much like Mr. Brown, made expansive and unspecific claims that he worked "sixty hours a week, every week, of his employment."[141] But in doing so, the employee "failed to specifically account for the hours worked . . . [and] failed to put forth any evidence regarding specific weeks where he worked beyond forty hours."[142] Here, as in *Holaway*, Mr. Brown's vague testimony, which fails to reference specific dates and hours worked on those specific dates, does not provide the necessary detail to survive summary judgment.[143] It is true that Mr. Brown discussed in his deposition the things he would do when working overtime.[144] But his description was too general to move the needle. It really is no different than the general description of work tasks in *Holaway*.[145] And it provides no way for a jury to deduce the amount and extent of that work as a matter of just and reasonable inference.[146]

The Court acknowledges that there was a significant drop in Mr. Brown's overtime hours from 2019 to 2020.[147] As noted above, Mr. Brown was paid for a total of 100.23 hours of overtime in 2019, 2.63 hours in 2020, and 9.2 hours in 2021.[148] Mr. Brown suggests this drop shows that

---

[141] *Id*. at 1060.

[142] *Id*. at 1059–60.

[143] *See id*. at 1058.

[144] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. For Summ. J. (Doc. 31-1) at 46–59.

[145] *See Holaway*, 771 F.3d at 1060.

[146] Recently, a sister court in this Circuit has found *Holaway* distinguishable when multiple employees claimed they worked overtime "every single day." *Deutsch v. My Pillow, Inc.*, No. 20-CV-00318-SRN-ECW, 2023 WL 3125549, at *16 (D. Minn. Apr. 27, 2023). There, the district court found that "[t]he jury need not speculate about when the overtime occurred during Plaintiffs' employment: it occurred at the beginning of each shift." *Id*. The district court went on to explain that "[t]he consistency and regularity of the [employees'] extra work contrasts with the failure to identify the hours worked in particular weeks or the tasks performed in *Holaway* and *Rapp*." *Id*. But the employees in *Deutsch* didn't only claim that they worked every single day; they also produced video evidence that supported this claim and that helped establish the length of overtime each day. *Id*. And, of course, there were multiple employees testifying to unpaid overtime. *Id*. Suffice it to say, the evidence in *Deutsch* was far more definite and certain than Mr. Brown's testimony that he worked anywhere from half an hour to three hours "just about . . . every day . . . ." *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. For Summ. J. (Doc. 31-1) at 48.

[147] *See* Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶¶ 11, 13.

[148] *Id*. at ¶¶ 11, 13–14.

Penske stopped paying him for overtime hours he worked in 2020.[149]  But that theory has a fatal flaw.  According to Mr. Brown, the "don't-pay-for-overtime" scheme began sometime in spring of 2020—a little before Penske implemented the Compensable Time Record Form regime—when Mr. Boone instructed Mr. Brown and other employees to not work overtime without approval.[150] If this is right, and if Mr. Brown was working a similar amount of overtime as he worked in 2019, then he would have recorded much more compensated overtime (approximately twenty-five hours or so) in the first half of 2020.[151]  But that didn't happen.  There are only 2.63 hours, all of which came in the first quarter of 2020.[152]  So no reasonable juror could infer—without resorting to speculation—that Mr. Brown was working the same overtime hours in 2020 that he was in 2019.

In summary, if there is any light between *Holaway* and the instant case, it's not on the visible spectrum.  Mr. Brown cannot show the extent of any uncompensated overtime work by just and reasonable inference.  So Penske deserves summary judgment, at least on the general overtime claim.

---

[149] *See* Sept. 12, 2023 Hr'g Tr. (Rough) at 43.

[150] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 31, 33–39, 108–09.

[151] *See* note 15 *supra*.

[152] There's also undisputed evidence that, at least with respect to 2020, Mr. Brown rarely asked Ms. Miller for approval to work overtime.  *See* Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶¶ 23–26; Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶¶ 11–14; Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 123 ("I don't ask to work overtime . . . and I didn't request it.").  And, of course, we know that Mr. Brown sustained an on-the-job injury in April of 2021 and was off work periodically on approved absences until June of 2021.  Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶ 15.  He worked under light-duty restrictions from mid-June of 2021 until mid-September of 2021.  *Id.*  Following an approved leave of absence, Mr. Brown returned to light-duty desk work on September 24, 2021, and remained under that restriction until November 11, 2021.  *Id.*  But Mr. Brown was then deemed unable to work, which led him to take another extended leave of absence until he resigned from Penske.  *Id.*  It makes sense that Mr. Brown did not request or work overtime during his leaves of absence and while on light-duty work restrictions, thus leading to the drop-off from 2019.

29

### III.    Mr. Brown's Claims of Falsified Time Records

Mr. Brown failed to provide any evidence from which a reasonable juror could conclude that Penske had him submit false Compensable Time Record Forms as part of a scheme to cover up (and not pay) non-*de minimis* overtime worked.  The record shows six times that Mr. Brown's hours were reduced by use of these forms.[153]  The record shows that two of the reductions were because Mr. Brown didn't clock out at the end of his shift.[154]  Absent those corrections, there would have been no clock-out time for the day, and Mr. Brown's hours would have far exceeded the time he worked.  Putting aside his general contention of working unpaid overtime every day, Mr. Brown does not suggest a specific recollection that, for those two days, the time adjustment was incorrect.[155]  So that leaves four Compensable Time Record Forms to address: two in November of 2020, one in April of 2021, and one in July of 2021.  The time reductions on those forms varied from three to five minutes each, for a total of seventeen minutes.[156]  But this time turns out to be *de minimis*.[157]

As the Eighth Circuit has explained, "[e]mployers are not required to pay employees for insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot

---

[153] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 122, 124, 126, 130, and 134–35. Mr. Brown asserted in his deposition that "there [are] a lot [of Compensable Time Record Forms] missing, actually." Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 104.  But he has no proof of this.  And he cannot estimate how many forms are allegedly missing, nor can he remember when he stopped filling out the forms. *See id.* at 104, 120.  Despite Penske producing Mr. Brown's Compensable Time Record Forms nearly eleven months before his deposition, Mr. Brown did not raise the missing-forms theory until then.  It does not appear to the Court that Mr. Brown has done anything since his deposition—over nine months ago—to obtain or otherwise discover these allegedly missing forms.  In these circumstances, no reasonable juror could conclude that there are missing forms.

[154] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 126, 134.

[155] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 98, 103.

[156] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 122, 124, 130, 135.

[157] *See* 29 C.F.R. § 785.47 ("In recording working time under the [FLSA], insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded.").

as a practical administrative matter be precisely recorded . . . ."[158]  "This legal concept [is] known as the *de minimis* doctrine . . . ."[159]  It "allows employers to disregard otherwise compensable work when only a few seconds or minutes of work beyond the scheduled working hours are in dispute."[160]  In considering whether the time is *de minimis*, the Eighth Circuit instructs district courts to consider (1) the amount of time spent on the extra work, (2) the practical administrative difficulties of recording additional time, (3) the regularity with which the additional work is performed, and (4) the aggregate amount of compensable time.[161]

Factors one, three, and four all weigh in favor of the Court finding that the four time reductions are *de minimis*.  The four reductions were for an average of 4.25 minutes and a total of seventeen minutes.[162]  While the amount of daily time spent on the additional work is important, there is "no precisely calculated, rigid durational period [that] applies . . . ."[163]  Most courts, however, "have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable."[164]  Moreover, the reductions occurred only four times over a period of no less than twelve months.[165]  This is irregular and infrequent.

For purposes of this analysis, we can assume factor two—the practical administrative difficulties of recording additional time—cuts strongly in favor of the reductions not being *de minimis*.  Penske had an established system to track time and catch any time worked after an

---

[158] *Lyons v. Conagra Foods Packaged Foods LLC*, 899 F.3d 567, 584 (8th Cir. 2018) (internal quotation marks and citations omitted).

[159] *Id.*

[160] *Id.* (internal quotation marks and citations omitted).

[161] *Id.*

[162] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 122, 124, 130, 135.

[163] *Lyons*, 899 F.3d at 584 (internal quotation marks and citations omitted).

[164] *Id.*

[165] *See generally* Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2).  Mr. Brown's first Compensable Time Record Form was submitted on June 22, 2020, and his last was submitted on July 8, 2021.

employee clocked out.[166]  Moreover, this is not a situation where recording the worked time was difficult, but rather where the employer (at least allegedly) reduced the time worked.  In the Court's view, the hard-lean towards Mr. Brown of this factor is overborne by the hard-lean away from Mr. Brown of the other three factors.

Consider the following.  There were only potentially four unlawful deductions over approximately twelve months.  One of these deductions was in July of 2021.[167]  It was a five-minute time deduction.[168]  Mr. Brown concedes that, around that general timeframe, Penske was allowing him to remain on the clock for sixty- to ninety-minute excursions to physical therapy during his normal working hours.[169]  Compared to the time he was being paid for not working, the five-minute dispute is trivial.  Even more trivial is the dispute occasioned by the November 23, 2020 form.[170]  That form adjusted Mr. Brown's hours for November 20, 2023.[171]  It reduced his hours by three minutes.[172]  In that week, Mr. Brown was paid for 39.97 hours.[173]  The three-minute deduction turns out to equate to 0.05 hours.  Even assuming this time was inappropriately deducted, the total unpaid overtime hours would have been 0.02.  It is nearly impossible to envision that as anything other than *de minimis*.  The other two deductions—one for five minutes and one for four minutes—had a similarly minimal effect on Mr. Brown's overall hours.[174]

---

[166] *See* Ex. 1 (Decl. of Karen Miller) to Resp. in Opp'n to Pl.'s Mot. for Conditional Certification (Doc. 17-1) ¶¶ 13–15; Ex. 1 (Decl. of Karen Miller) to Defs.' Mot. for Summ. J. (Doc. 25-1) ¶¶ 4–6.

[167] Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 135.

[168] *Id.*

[169] *See* Ex. 1 (Dep. of Lawrence Brown) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 31-1) at 147–48.

[170] *See* Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 124.

[171] *Id.*

[172] *Id.*

[173] Ex. 1 (Employee Earning Records) to Defs.' Mot. for Summ. J. (Doc. 25-1) at 18.

[174] *See id.* at 18, 21.

Overall, no reasonable juror could conclude that the Compensable Time Record Forms were used to systemically reduce Mr. Brown's hours.  In its Order Denying Conditional Certification, the Court noted that Mr. Brown painted quite the sordid picture.[175]  Discovery has, however, uncovered a completely different picture under the one painted in Mr. Brown's Complaint.  Mr. Brown originally sketched a claim concerning a vast conspiracy by Penske against its employees to systemically deny them overtime compensation by requiring them to falsify their Compensable Time Record Forms.  Now, the underlying canvas reveals only a few instances of minor deductions over the course of more than a year.   In fact, there were nearly three times as many instances where adjustments made by way of the Compensable Time Record Forms redounded to the benefit of Mr. Brown, adding time instead of reducing it.[176]  Based on the record before the Court, any unwarranted reductions in Mr. Brown's overtime compensation via the Compensable Time Record Forms were *de minimis*.  No reasonable juror could conclude otherwise.  Penske is entitled to summary judgment as a matter of law.

## CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED this 29th day of September 2023.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[175] *See* Order (Doc. 24) at 5.

[176] *See* Ex. 2 (Compensable Time Record Forms) to Defs.' Mot. for Summ. J. (Doc. 25-2) at 114, 116–121, 123, 125, 127–29, 131–33, 136.